[No. 7268–8–II.  Division Two.  May 6, 1986.]

CLALLAM COUNTY, *Respondent,* v. THE PUBLIC
EMPLOYMENT RELATIONS COMMISSION,
ET AL, *Appellants.*

*Kenneth O. Eikenberry, Attorney General,* and *Richard A. Heath, Senior Assistant,* for appellant State.

*Herman L. Wacker, William H. Song,* and *Davies, Roberts, Reid & Wacker,* for appellant Teamsters.

*David Bruneau, Prosecuting Attorney,* and *Michael D. Chinn, Deputy,* for respondent.

ALEXANDER, J.—The Washington State Public Employment Relations Commission (PERC) and the International Brotherhood of Teamsters Local 589 appeal the Superior Court's reversal of PERC's determination that Clallam County committed an unfair labor practice. We reverse.

Mark Baker began work for Clallam County as an appraiser–trainee in the county assessor's office on November 1, 1979, and was terminated by the County on October 22, 1980. On January 22, 1981, Baker's union, Teamsters Local 589 (the Union) filed a complaint with PERC alleging that Baker's discharge violated the provi-

sions of RCW 41.56. A hearing examiner thereafter conducted a hearing on the matter and the transcript of that hearing revealed the following factual background to Baker's discharge.

Baker's educational background included graduation from Sequim High School third in his class, B.S. degree from the United States Military Academy, master's degree from the University of Southern California, and studies toward a 2–year degree in real estate at Peninsula Junior College. According to all accounts, Baker performed his duties for Clallam County satisfactorily with respect to the quality and quantity of his work. However, he was beset with a series of run–ins with his superiors that began soon after he commenced his employment with the County.

At the first of the year in 1980, Baker and his superiors disagreed over the interpretation of a vacation pay section of the Collective Bargaining Agreement in effect for Clallam County employees.

Baker interpreted the agreement to allow a person to schedule a vacation day concurrent with a holiday and receive double pay.[1] Consequently, Baker submitted a written request to his superior to be allowed to take each of his vacation days on scheduled holidays. When Arleigh Linnell, chief appraiser in the county assessor's office, denied Baker's request, Baker replied that "that's the way the Union contract reads." Linnell then went to his superior, Lester Lancaster, the Clallam County Assessor, to discuss Baker's request. Linnell and Lancaster then called the Union to determine its interpretation of the agreement. The secretary–treasurer of the Union came to the assessor's office and explained to Baker that the section applied only if the holiday happened to fall within an employee's scheduled vacation time. Baker did not pursue this request any fur-

---

[1]Article 11, section 2.6 of the agreement provides:

"If a holiday falls during an employee's vacation, said employee shall receive pay for the holiday in addition to vacation pay if requested in writing before going on vacation or the employee may receive an extra day of vacation, at the option of the employee."

ther.

Baker's next confrontation with his superiors grew out of the adoption of a personnel ordinance by the Clallam County Board of County Commissioners. The ordinance, which was adopted on June 30, 1980, made it possible for appraiser–trainees, who met certain minimum qualifications, to become appraisers after a 3–month probationary period. After Baker had completed all of the requirements for promotion, he checked his personnel file to make sure he was eligible to be promoted. He determined that he was, and thus expected to receive notice of his promotion. In early August, Baker still had not been promoted so he complained orally to Linnell. Linnell refused Baker's promotion request. Baker then drafted a written grievance and reviewed it with a Union representative. At this point, Baker set up a meeting with Lancaster, holding his written grievance in reserve pending his discussion with Lancaster. Two meeting dates passed before Lancaster actually met with Baker.

A meeting between Lancaster, Linnell, and Baker took place on August 11, 1980. After some discussion, Lancaster indicated that he would have to consider the matter before making a decision and that he would get back to Baker. Baker then reminded Lancaster of the 10–day time limit imposed on an employee for filing a grievance under the Collective Bargaining Agreement. Lancaster told Baker not to worry about the deadline, and Baker said "fine," but that he would need assurance in writing. Lancaster then asked Baker, "[W]hy[,] isn't my word good enough?" Baker replied "No, it's not." When asked why, Baker noted that "first off, you've made an appointment to see me and then not seen me which to me is violating your trust." Lancaster then asked Baker if there was any other reason Baker did not trust him and Baker replied "yes" because an "honorable man would not have signed this year's re–evaluation . . ." because the reevaluation was "a piece of shit." Baker went on to explain why he held this opinion, at which point Lancaster ordered Baker out of his office.

About 1 hour after the meeting, Linnell summoned Baker to his office and told Baker that Baker was violating hiring criteria because his car was not licensed in the state of Washington. Linnell also suggested to Baker that a person who does not trust his supervisor should look for another position.

On August 15, 1980, Baker was promoted to the position of appraiser. At the same time, he received a letter of reprimand for his comments to Lancaster at the August 11 meeting.

Following this incident and until the event which resulted in his discharge, Baker went on with his job with only minor difficulty. At one point Baker signed up for and took a "Commercial I" test without the authority of his superiors. Baker was supposed to be taking a "Residential I" test, but he decided to take both tests and did well on both. Baker later requested permission from Linnell to take the "Commercial II" course. Linnell denied him permission, indicating that Baker could not take the course because Linnell had not even had a chance to take it. Despite this denial, Baker ordered the course material to be sent to him at his own expense. When Linnell discovered this, he expressed his disapproval to Lancaster.

The final incident occurred on October 21, 1980. Linnell previously had informed the appraisers that they must "get the [county] cars out of the parking lot on occasion so the Commissioners did not see them . . ." Linnell also told the appraisers that he wanted a majority of the paperwork done in the field because "the Commissioners saw [them] in the office and it looked bad." Baker indicated that he thought "in the field," which was not defined by a written or oral rule, meant outside the office.

Pursuant to his understanding of Linnell's instructions, Baker decided to spend October 21 doing paperwork at the Peninsula College Library rather than drive to his assigned area in the town of Forks and work in his car. Baker stated that other appraisers had used the college library, which is located about 5 minutes from the courthouse, to do their

paperwork. He indicated that he chose to work at the library because he had a great deal of paperwork and it was extremely awkward to attempt to do it in his automobile. In keeping with the edict to keep county cars out of sight of the commissioners, Baker parked the car in the Playhouse Center parking lot which is surrounded by brush and is immediately adjacent to the college library. The car was well hidden and could not be seen from the road.

About midafternoon on that day, the sheriff's office noticed the county's car in the Playhouse parking lot and called the assessor's office to see if they knew anything about it. Linnell and Lancaster went to the parking lot to investigate and then removed the car, taking it back to the courthouse. When Baker finished his work for the day he came out and discovered the car was gone. Baker left, and later came back to see if the car had been returned. In the meantime, Linnell and Lancaster had returned the car and were waiting to see who would show up.

When Baker arrived at the car, Linnell ordered Baker back to the office. Baker then met with Linnell, Lancaster, and Baker's "lead man," William Corcoran. Baker attempted to offer an explanation, but Linnell stated that he had made up his mind and he told Baker that he was terminated for his misuse of the county vehicle.

Don Lane, the Union representative, indicated at the hearing that Linnell and Lancaster objected to Baker's "running to the Union all the time" with little problems he had in the office. William Corcoran testified that "in the field" means in your assigned reevaluation area. Corcoran said that he did work at Peninsula College when it was within his assigned area. He also stated that he had told Baker not to park the county car right on the main street. Jack Witschger, a deputy assessor, testified that the internal policy of the assessor's office was to do paperwork in the office. Lancaster testified that one deputy assessor, who took a county car to his home during the day to do work, had not been fired.

Finally, a tape from a Clallam County Commissioners

hearing[2] was introduced into evidence at the PERC hearing, and a portion of the transcription was read into the record. It revealed Linnell indicating to the Commissioners that the vacation pay request showed an unwillingness on Baker's part to accept supervision and was a fact, along with others, that led to his dismissal.[3]

At the PERC hearing, Linnell attempted to clarify the meaning of his statements to the Commissioners by explaining that the vacation pay request was one of many little things that indicated an attitude problem with Baker. Linnell also emphasized that he was wrong when he told the Commissioners that Baker had taken the vacation problem to the Union. Further, Linnell noted that Baker was not fired after the August 11 insubordination incident because the assessor's office was suffering from a lack of manpower at that time.

At the close of the hearing, the examiner held that Clallam County had violated RCW 41.56.140(1) by discharging Baker for exercising rights guaranteed by the Public Employees' Collective Bargaining Act, RCW 41.56. PERC affirmed the examiner's decision.[4] The County appealed to

---

[2]The hearing related to Baker's entitlement to unemployment benefits.

[3]The portion of the tape read into the record is as follows:

"Mr. Linnell: . . . And I want to make it clear that we are not questioning his work at all; just his work habits and what led to this dismissal. A lot of the points that I'm going to bring up are minor points that we could have lived with had not the major points arisen. I want to try to start from the beginning; I can't start at the first of November when he was hired because I did not take over this position until the first day of January. The first contact that we had with his unwillingness to accept the supervision in the office was when he went and tried to use the Union contract to sell back to the Department his vacation time and furthermore, he carried this one to the Union and the Union did talk to him with us present.

"A commissioner: Excuse me, Arleigh. What do you mean by sell back?

"Mr. Linnell: He wanted to take his vacation only on holidays. He did not want to take a vacation as a vacation is intended to be used. He had his vacation scheduled only for holidays."

[4]PERC ordered Clallam County to post a notice to its employees saying that it would not discriminate against any employee because of their exercise of protected activities under RCW 41.56. PERC further ordered Clallam County to

the Clallam County Superior Court, which reversed the administrative decision finding it to be clearly erroneous. Baker appeals that decision to this court.

The administrative procedure act sets out the standard appropriate for judicial review of an administrative decision. RCW 34.04.130(6).[5] RCW 34.04.130(6) provides, in pertinent part:

> The court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse the decision if the substantial rights of the petitioners may have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> . . .
>
> (d) affected by other error of law; or
> (e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; . . .
> (f) arbitrary or capricious.[6]

■ Appellate court review of an administrative decision is made on the record of the administrative tribunal itself, not the superior court record. *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 324, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106, 74 L. Ed. 2d 954, 103 S. Ct. 730 (1983). The appellate court conducts a de novo review of the record of the administrative tribunal to determine questions of law. *Franklin Cy. Sheriff's Office*, 97 Wn.2d at 324. On questions of law, the reviewing court may essentially substitute its judgment for that of the administrative body. *Franklin Cy. Sheriff's Office*, 97 Wn.2d at 325. However

> [i]n cases where the administrative agency is charged with administering a special field of law and endowed

reinstate Baker to his former or a substantially equivalent position with back pay and without prejudice to any seniority rights or privileges.

[5]The act applies to all agencies not specifically excluded by the statute. RCW 34.04.150. PERC decisions are not excluded.

[6]Clallam County has not asserted that PERC's decision was arbitrary and capricious. Therefore, we will not discuss this aspect of the standard of review.

with quasi–judicial functions because of its expertise in that field, its construction of statutory words and phrases and legislative intent should be accorded substantial weight when undergoing judicial review.

*Short v. Clallam Cy.*, 22 Wn. App. 825, 832, 593 P.2d 821 (1979). Specifically, great deference should be given to PERC's expertise in interpreting labor relations law. *Public Empl. Relations Comm'n v. Kennewick*, 99 Wn.2d 832, 842, 664 P.2d 1240 (1983). *See also International Ass'n of Firefighters, Local 469 v. Public Empl. Relations Comm'n*, 38 Wn. App. 572, 686 P.2d 1122 (1984).

In determining questions of fact, an administrative decision shall be reversed if it is "clearly erroneous". A decision is "clearly erroneous" when, based upon the record before it, the reviewing court is "firmly convinced that a mistake has been committed, . . ." *Department of Ecology v. Ballard Elks Lodge 827*, 84 Wn.2d 551, 555, 527 P.2d 1121 (1974). In making this determination, the reviewing court must give due deference to "the specialized knowledge and expertise of the administrative agency. The reviewing court cannot simply substitute its judgment for that of the agency." *Department of Ecology*, 84 Wn.2d at 556. PERC is an administrative body which is to be accorded deference with regard to its fact–finding. *Public Empl. Relations Comm'n v. Kennewick*, 99 Wn.2d at 842.[7]

Applying this standard of review we must determine whether PERC properly concluded that Clallam County committed an unfair labor practice when it terminated Mark Baker.

The pertinent statute, RCW 41.56.140, provides, in part:

It shall be an unfair labor practice for a public em–ployer:
(1) To interfere with, restrain, or coerce public em–ployees in the exercise of their rights guaranteed by this chapter;

---

[7]RCW 41.58.010(2) provides that when making appointments to PERC, the Governor "shall be cognizant of the desirability of appointing persons knowledgeable in the area of labor relations in the state."

This section is nearly identical to section 8(a)(1) of the Labor Management Relations Act (29 U.S.C. § 158(a)(1)).

The National Labor Relations Board set out the appropriate test to be used in conjunction with actions maintained under section 8(a)(1) of the Labor Management Relations Act. *Wright Line,* 251 N.L.R.B. 1083, 105 L.R.R.M. 1169 (1980). The Board modeled a 2–part causation test after the test established by the United States Supreme Court in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 50 L. Ed. 2d 471, 484, 97 S. Ct. 568 (1977). This court approved that test in *Washington Pub. Employees Ass'n v. Community College Dist. 9,* 31 Wn. App. 203, 211, 642 P.2d 1248 (1982) as the appropriate legal standard to be applied in cases filed under RCW 41.56.140. *Washington Pub. Employees Ass'n,* 31 Wn. App. at 212. The test initially places the burden

> on the employee to show that his conduct was protected and that such conduct was a substantial or motivating factor in the employer's decision to discharge him. Once this is accomplished, the burden shifts to the employer to demonstrate that it would have discharged the employee even absent the protected conduct. . . .

*Washington Pub. Employees Ass'n,* 31 Wn. App. at 211. In order for the employee to meet his burden, he need only make a prima facie showing. *Wright Line,* 105 L.R.R.M. at 1175. In other words, Baker need only make a showing sufficient to support the inference that protected conduct was a motivating factor in the County's decision to terminate him. *Wright Line,* 105 L.R.R.M. at 1175.

In analyzing whether Baker carried his burden, three questions must be answered. First, we must determine whether Baker's actions with regard to his vacation pay request and his promotion were "grievance[s]" under the collective bargaining agreement. A grievance is defined by article 9, section 2 of the agreement as "an issue raised by an employee or the bargaining representative relating to the interpretation of rights, responsibilities, benefits or conditions of employment covered in the agreement."

The County places great weight on the fact that Baker did not personally take the issue of vacation pay to the Union. Also, the County emphasizes the fact that Baker's written grievance concerning his promotion was never filed.[8] These positions are not well taken. As we have noted, a grievance, under the agreement, is simply an issue, not a formalized process or special document. Further, article 9, section 3 of the collective bargaining agreement specifically states that a grievance may be presented verbally to the employee's immediate supervisor. We conclude, therefore, that both Baker's request for vacation pay and his promotion request constituted the raising of "grievance[s]" pursuant to the terms of the collective bargaining agreement.

Second, we must decide whether raising a grievance is an activity protected under RCW 41.56. RCW 41.56-.030(4) defines collective bargaining to include executing written agreements with respect to grievance procedures. Although there is no case authority directly on point, we believe that because the Legislature included the execution of agreements relating to grievance procedures in its definition of collective bargaining, it must have intended that the pursuing of such grievances be a protected right under RCW 41.56. We hold that Baker's actions in pursuing the resolution of his vacation pay and promotion concerns are clearly protected rights under RCW 41.56.[9] It follows that

---

[8]The superior court judge, although not required to do so, made findings of fact and conclusions of law. The judge concluded that the only protected activity engaged in by Baker was the promotion request. The judge indicated that the vacation pay incident was not a "grievance," and therefore not a protected activity, because Baker filed no actual document nor did he contact the Union directly.

[9]The County attempts to argue that Baker could not use Union procedures nor did he have Union rights at the time he presented his grievances because he was still a trainee. This argument is not persuasive. Baker's personnel file indicates that he was considered a member of the Union. We note also that the National Labor Relations Board has held that employees in trainee status are treated the same as regular employees if they share the same working conditions and interests. *Erie Marine Div., Rust Eng'g Co.*, 195 N.L.R.B. 815, 79 L.R.R.M. 1494, 1495–96 (1972).

it would be an unfair labor practice for a public employer to discharge an employee for engaging in the protected right of pursuing a grievance.

The third and final question with regard to Baker's burden of proof is whether Baker's pursuit of grievances concerning vacation pay and promotion were motivating factors in Clallam County's decision to terminate Baker. A thorough reading of the record supports PERC's decision that these incidents did play a motivating role in Baker's termination. Linnell stated that these incidents were minor and that they were not the real reason Baker was fired. However, Linnell testified in a prior hearing that the vacation pay incident did play a role in the County's decision to fire Baker. Also, Linnell's and Lancaster's testimony indicated that they were greatly upset by the promotion incident.

As we have indicated, Baker need only make a prima facie showing, *i.e.,* one which will support an inference that his protected rights were *a motivating factor* in the County's decision. As the reviewing court, we must decide only whether PERC's decision that Baker made such a showing was "clearly erroneous." Because we are not "firmly convinced that a mistake has been committed, . . ." *Department of Ecology,* 84 Wn.2d at 555, we hold that the Board's decision was not "clearly erroneous". Simply because "there was credible evidence contrary to the tribunal's findings, the findings are not 'clearly erroneous'". *Franklin Cy. Sheriff's Office,* 97 Wn.2d at 325.

Once the burden is met by the employee, the second part of the test comes into play. It requires that Clallam County establish that Baker would have been fired even if Baker had not engaged in the protected conduct of raising the vacation pay and promotion questions. In order to meet its burden, the County relied on testimony indicating the importance of the October 21, 1980 hidden car incident.

The record indicates that Baker was doing county work at the library and that he thought he was following the unwritten policies of the assessor's office. The record, how-

ever, also suggests that Baker's interpretation of the informal policies was mistaken. Linnell indicated that the cars should be out of the courthouse parking lot, but not necessarily well hidden. Also, Corcoran's testimony indicates that Baker's understanding of "in the field" was incorrect.

■ We are not firmly convinced that PERC was mistaken when it concluded that the County did not sustain its burden of proving that Baker would have been fired even if the protected conduct had not taken place. Further, we believe that PERC was correct in concluding that the evidence suggesting that other appraisers had used the college library and had otherwise misused County vehicles severely undercuts the County's effort to meet its burden of proof. This evidence goes to the issue of disparate treatment, which, contrary to the County's assertion, is an aspect of the employer's burden of proof. *Wright Line,* 105 L.R.R.M. at 1176. Evidence that other employees have engaged in the same type of conduct that led to this employee's termination undermines the employer's showing. *Wright Line,* 105 L.R.R.M. at 1176.

Although we recognize that Baker may not have been an exemplary employee, there being evidence that he had trouble following orders and maintaining the proper respect for his superiors, we do not believe after reviewing the entire record that it can be said that the administrative determination that Baker's termination resulted from Baker's engaging in protected conduct is clearly erroneous.[10] Therefore, we reverse the decision of the trial court and reinstate the administrative determination.

WORSWICK, C.J. (concurring)—I would not have done

---

[10]PERC also made a conclusion of law, erroneously labeled a finding of fact, which states that the County's true motivation for terminating Baker stemmed from antiunion animus. We do not believe that this conclusion is supported by the evidence, because the assessor's relations with the Union were apparently normal. However, this does not affect our decision. It is not necessary that an antiunion animus be found to exist in order for Baker to prevail if interference with protected rights takes place for any reason.

with this case what PERC did, but I am not PERC. We have adopted federal law in dual–motive cases as our own. *Washington Pub. Employees Ass'n v. Community College Dist. 9,* 31 Wn. App. 203, 642 P.2d 1248 (1982). That law makes it absurdly easy for an employee to make a prima facie case and exquisitely difficult for an employer to overcome it. Therefore, I must defer to PERC's conclusion that *a* motive for Baker's termination was his engagement in protected activities.

However, I agree with the dissent in two particulars. First, PERC's conclusion (or finding) that Clallam County was motivated by antiunion animus is unsupported by the record; indeed, it is preposterous. Second, the copious quotations from Baker's resume employed in the lead opinion do not accurately describe Baker. He was more than a "sealawyer"; he was a churl and Clallam County is well rid of him.

REED, J. (dissenting)—I respectfully dissent because of my firm conviction that a mistake has been committed and that the PERC decision was clearly erroneous in view of the entire record and the public policy contained in the Public Employees' Collective Bargaining Act, RCW 41.56.

Although the majority purports to embrace the correct clearly erroneous standard, it proceeds, nevertheless, to reverse the trial court and affirm the Board on what only charitably can be described as "substantial evidence". In my opinion, the evidence is hardly more than a "scintilla", and falls far short of supporting a conclusion that Clallam County acted in retaliation for Baker's resort to "protected activities" to secure his ends.

PERC determined that Clallam County committed an unfair labor practice when it fired Baker because the latter relied on the union contract in an attempt to extort additional employee benefits from the County—double vacation pay. The only evidence to support this conclusion is Linnell's unfortunate and ill–advised remark to the County Commissioners. As noted by the majority, this was not fac-

tually correct—it was the County that sought union intervention and interpretation of the contract. The majority also overlooks the fact that Linnell clarified this statement in his actual testimony before the Board, thus rendering his prior—perhaps inconsistent—statement of little value except for impeachment purposes.

Conceding arguendo that Linnell's prior statement, even when so viewed, made a prima facie case for Baker under the *Wright Line* case, as adopted by *Washington Pub. Employees Ass'n v. Community College Dist. 9*, 31 Wn. App. 203, 642 P.2d 1248 (1982), thus placing a burden on the County to come forward with its evidence, *Wright Line*, 251 N.L.R.B. 1083, 105 L.R.R.M. 1169 (1980), I believe the County satisfied that burden with its showing it did not in fact fire him for resorting to rights guaranteed by the union–negotiated contract.

I have no quarrel with the majority's definition of protected rights under RCW 41.56.140, nor with the conclusion that pursuing, although informally, the grievance procedures as defined in the labor agreement is a protected activity. However, when one considers the "entire record as submitted and the public policy contained in [RCW 41.56-.140]," the inevitable conclusion is that Clallam County was not motivated by a desire to penalize Baker for resorting to his "protected rights". PERC's finding to the contrary is extremely suspect in light of its determination that the County's real or true motivation for terminating Baker was "antiunion animus".[11] As noted by the trial court, there is absolutely no evidence of such ill will or animus. In my view this totally unsupported finding permeates and taints all of PERC's ultimate determinations. Consequently, PERC's actions were clearly erroneous.

As noted, Clallam County itself enlisted the union's

---

[11]Contrary to the majority's opinion that this is a conclusion of law, I believe it is a finding of fact. Because it finds that the "true" motivation was union animus, and there is absolutely no evidence to support that finding, PERC's determination should not stand.

counsel to resolve Baker's attempt to extort extra vacation pay from the County by his gross misinterpretation of the union contract. It was the *substance* of this request and not the fact he relied on the union contract that caused his employer to be upset. Baker's aggressive and contentious "sea lawyer" attitude stands out in the record and would have tested the patience of Job. Had it not been for a shortage in manpower, his insubordination clearly would have led to dismissal. It stretches credulity to find that he was dismissed because the union had a contract and Baker was merely exercising his rights to engage in "protected activities" as such.

While it is true, as the majority says at page 600, that "[s]imply because 'there was credible evidence contrary to the tribunal's findings, the findings are not "clearly erroneous"'", citing *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 325, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106 (1983), the reverse proposition is not true, *i.e.,* that "simply because there is credible evidence to support the Board's finding, the findings are not clearly erroneous." This is merely another way of stating the substantial evidence rule, a lesser standard of review—a standard to which we are not bound.

In conclusion, although there may have been some evidence to support the Board's conclusion, after examining the entire record and considering the policy of the act in question, I am left with a definite and firm conviction that a mistake has been committed. *Ancheta v. Daly,* 77 Wn.2d 255, 461 P.2d 531 (1969). I would affirm the trial court's order reversing the Board.

Reconsideration denied May 30, 1986.

Review denied by Supreme Court September 2, 1986.